**SIGNED THIS: September 26, 2014**

_____
**Mary P. Gorman**
**United States Chief Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 13-70172 |
| TONY LEE CARTER and | ) | |
| BRANDI MICHELLE CARTER, | ) | Chapter 13 |
| | ) | |
| Debtors. | ) | |

## O P I N I O N

Before the Court is an Application for Compensation and Reimbursement Pursuant to 11 U.S.C. §330 filed by Attorney Robert Follmer on behalf of his firm, Ostling & Associates, seeking an award of fees for representing the Debtors in this Chapter 13 case. The Application requests approval of attorney's fees of $2362.50 and paraprofessional fees of $490 for a total of $2852.50. For the reasons set forth herein, the Application will be allowed in the amount of $600 and denied in all other respects.

–1–

## I. Factual and Procedural Background

Tony Lee Carter and Brandi Michelle Carter ("Debtors") began their relationship with Ostling & Associates by meeting with Attorney Lars Eric Ostling twice in June 2012 to discuss filing bankruptcy to save their home. Time records indicate that their next contact with Mr. Ostling was in late January 2013 to again discuss a bankruptcy filing. Attorney Larry Spears filed a voluntary petition under Chapter 13 for the Debtors on February 4, 2013, after meeting with the Debtors for just a few minutes on that same day. Since the filing, Attorneys Jeffrey Abbott, Robert Follmer, Brian Pondenis, and Nicolas Nelson have appeared on behalf of the Debtors at in-court and telephonic hearings. And in addition to Mr. Spears, Attorneys Abbott, Follmer, Pondenis, and Jason VanHemert have filed documents on behalf of the Debtors.

The Debtors' initial filing included only a skeleton petition, credit counseling certificates, statement of social security numbers, and mailing matrix. On February 18th, Mr. VanHemert filed the Statement of Financial Affairs and several schedules, although the time records do not indicate that Mr. VanHemert met with the Debtors prior to doing so. On their Schedule A, the Debtors listed their residence at 14 Delmar Drive in Clinton, Illinois, with a value of $192,000 and a commercial building at 400 W. Woodlawn in Clinton, Illinois, with a value of $0.00. On February 25th, Mr. Spears filed the remaining schedules, the summary of schedules, declaration concerning schedules, the statement of current monthly and disposable income, as well as the Chapter 13 Plan ("Plan"). The time records show that Mr. Spears had no additional contact with the Debtors after their short

meeting before the case was filed and that he spent no more than six minutes reviewing the documents he filed. All of the documents filed by Mr. VanHemert and Mr. Spears were prepared by clerical staff.

The Plan provided for the payment of trustee compensation, attorney's fees, priority tax claims to both the Internal Revenue Service and Illinois Department of Revenue, the cure of a mortgage arrearage on the Debtors' residence in the amount of $25,000 to JPMorgan Chase Bank, loan payments for an automobile, a truck and a boat, and real estate taxes to the DeWitt County Collector. The Plan provided no dividend for unsecured creditors. On March 5th, Ideal Auto Sales ("Ideal") filed an objection to confirmation of the Plan as well as a motion to modify stay with respect to the Debtors' automobile.

The Debtors' meeting of creditors was held on April 4th. The Chapter 13 Trustee's confirmation report identified a number of problems in the case including missing pay advices, missing tax returns, needed bank statements and profit and loss statements, requested valuation information for the commercial building, and inaccurate schedules. The confirmation report stated that an amended plan was expected to be filed within twenty-eight days.

After conducting telephonic hearings on Ideal's motion to modify stay on April 4th with Ideal's counsel and Mr. Pondenis and then again on April 18th with Ideal's counsel and Mr. Follmer, the Court scheduled an evidentiary hearing for May 14th. As an amended plan had not yet been filed, a hearing on the Plan was set for the same date. Mr. Follmer appeared on behalf of the Debtors and charged time on May 13th for reviewing the documents and preparing for the hearing, and

on May 14th for attending the hearing, travel, and discussing the outcome with staff. After taking evidence and hearing arguments, the Court denied the motion to modify stay but noted that it was "a serious failure" on the part of the Debtors' counsel not to have previously moved to provide adequate protection payments to Ideal. An order was entered the same day denying confirmation of the Plan and granting the Debtors until June 4th to file an amended plan.

On June 3rd, JPMorgan Chase Bank filed a motion to modify stay with respect to the Debtors' residence, alleging that post-petition mortgage payments had not been made. The next day, Mr. Spears filed a First Amended Plan on behalf of the Debtors but again does not appear to have met with the Debtors or to have discussed the terms of the First Amended Plan with them before it was filed. The First Amended Plan was prepared by clerical staff.

The Trustee filed an objection to the First Amended Plan chronicling a number of problems, including that the amounts due to the Internal Revenue Service and Illinois Department of Revenue were not clear, the status of JPMorgan Chase's claim was unsettled, and "[t]he DeWitt County Collector is not listed on Schedule D or F and is unlikely to have received any notice of the filing of the case." The Trustee also identified deficiencies such as a lack of information about Mrs. Carter's 401K loan, the Debtors' failure to list all of their trailers on Schedule B, the nondisclosure of Mr. Carter's ownership interest in a construction business, and the questionable valuation of zero for the commercial building on Schedule A.

A telephonic hearing on JPMorgan Chase's motion was held on June 27th,

–4–

and Mr. Abbott appeared on behalf of the Debtors. The creditor's counsel advised that the post-petition default had been cured except for fees and costs, and that the parties had agreed to enter into a repayment order. Mr. Abbott logged time on June 26th for reviewing the file and preparing for the hearing and on June 27th for attending the hearing, travel, and discussing the outcome with staff.

The Court scheduled a confirmation hearing on the First Amended Plan for July 23rd. Mr. Nelson logged time on July 22nd for reviewing the file and preparing for the hearing. Mr. Nelson appeared at the hearing and requested fourteen days to file another amended plan. He charged time for attending the hearing, travel, and discussing the outcome with staff.

On August 6th, Mr. Spears filed a Second Amended Plan for the Debtors. Again, the Second Amended Plan was prepared by clerical staff. Mr. Spears did not meet with the Debtors before filing it and he spent just a few minutes reviewing it. The Trustee filed an objection to the Second Amended Plan pointing out a number of deficiencies including that the Trustee was instructed to pay real estate taxes to the DeWitt County Collector but an Amended Schedule D had added the DeWitt County Clerk and Recorder rather than the Collector to the schedules and, although the Amended Schedule D placed a $40,000 value on the commercial building, Schedule A continued to list the value as $0.00. The Trustee's objection also pointed out that Schedule B continued to fail to list or value the construction business and did not disclose a 2004 trailer or a 2007 trailer that Mr. Carter admitted to owning at the first meeting of creditors.

The Court scheduled a hearing on confirmation of the Second Amended Plan

for September 24th. On September 23rd, Mr. Spears filed a Third Amended Chapter 13 Plan. The Third Amended Plan was prepared by clerical staff and filed by Mr. Spears again without meeting with the Debtors. Mr. Follmer logged an hour's time for meeting with the Debtors several days before the Third Amended Plan was filed to discuss issues about their residence, a vehicle, and valuation of their business. Mr. Follmer does not appear to have been involved in the preparation, review, or filing of the Third Amended Plan.

The Third Amended Plan proposed that the secured claim of JPMorgan Chase Bank would be paid directly by the Debtors, yet also proposed that the "[Debtors] will surrender their interest in real estate located at 14 Delmar Drive, Clinton, IL 61727 financed through Chase Bank." The Trustee filed an objection to confirmation of the Third Amended Plan. In the objection he pointed out that the prior plan had the Trustee paying back real estate taxes but that the payee — the DeWitt County Collector — was still without notice. The Third Amended Plan now proposed for the Debtors, instead of the Trustee, to pay the real estate taxes directly to the DeWitt County Collector. The Trustee suggested that the change in treatment may have been because the Debtors' attorneys failed to file a proof of claim for the DeWitt County Collector following the expiration of the government claims bar date. Finally, the Trustee pointed out the discrepancies in the treatment of JPMorgan Chase Bank, with the Third Amended Plan proposing to both pay the residential mortgage and surrender of the same real estate to the creditor.

A hearing was scheduled on the Third Amended Plan for November 12th.

Earlier that day, Mr. VanHemert filed a Fourth Amended Plan. As with the prior plans, the Fourth Amended Plan was prepared by clerical staff, and the Debtors did not review the Fourth Amended Plan before it was filed. The hearing was held as scheduled. Mr. Follmer appeared and stated that the Fourth Amended Plan had been filed in order to address the Trustee's objection with respect to the residence subject to the JPMorgan Chase mortgage which the Debtors intended to surrender. Mr. Follmer admitted that no notice of the case filing had ever been given to the DeWitt County Collector. The Court stated that it would send out the Fourth Amended Plan on an objection notice but that, because of the many errors and omissions, the Court would not award the "no-look" fee to Ostling & Associates if and when a plan was finally confirmed. The Court expressed concern that mistakes had been repeatedly pointed out and not corrected, and that it was obvious that attorneys and staff who were not familiar with the issues were drafting and filing plans at the last minute.

On November 22nd, the Trustee filed his objection to the Fourth Amended Chapter 13 Plan wherein he reiterated his prior objections regarding inaccurate schedules, including the failure to properly value the commercial real estate and the failure to disclose ownership of two trailers, along with an objection relating to the failure to provide full payment of a priority claim filed by the Illinois Department of Revenue.

On January 13th, Mr. Follmer filed a Fifth Amended Plan, an Amended Schedule A which for the first time properly valued the commercial building, and an Amended Schedule B which for the first time disclosed the Debtors' ownership

interest in two trailers. No objections were filed to the Fifth Amended Plan, and an Order Confirming Fifth Amended Plan was entered on February 13th.

Mr. Follmer filed the Application for Compensation ("Fee Application") as required because the Court had previously stated that the "no-look" fee would not be awarded. Although no objections were filed to the Fee Application, after reviewing the time records attached to it, the Court noticed several discrepancies which suggested that the Fee Application was not based upon contemporaneously-kept time records. The Court requested Mr. Follmer to file an affidavit clarifying whether Ostling & Associates maintains contemporaneous time records for all attorneys in all cases and to explain the methodology used to create the time records submitted with the Fee Application. Mr. Follmer filed his affidavit assuring the Court that Ostling & Associates' attorneys maintain "contemporaneous transactional records" but then went on to explain a methodology which he describes as "reconstruction of time entries." The described methodology clearly establishes that some of the time entries do not reflect the actual time expended and many, perhaps most, entries on the Fee Application are not the product of contemporaneous time keeping. The matter is ready for decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. The particular issues raised here are core proceedings. *See* 28 U.S.C. §157(b)(2)(A),(B).

## III. Legal Analysis

### A. Debtors' Attorneys Are Not Entitled to Full "No-Look" Fee

This Court has previously set forth in detail the requirements for attorneys who represent debtors in Chapter 13 cases, and for Ostling & Associates' attorneys in particular, to receive the full "no-look" fee available under this Court's Standing Order Regarding Attorneys Fees for Debtor's Counsel in Chapter 7 and 13 Cases (revised 1/1/14) ("Standing Order"). *See, e.g.*, *In re Bergae*, 2014 WL 1419586 (Bankr. C.D. Ill. Apr. 11, 2014); *In re Brennan*, 2013 WL 4046447 (Bankr. C.D. Ill. Aug. 8, 2013); *In re Eskew*, 2012 WL 4866687 (Bankr. C.D. Ill. Oct. 12, 2012). The requirements need not be repeated here because the failings of the Debtors' attorneys here are not based on a lack of knowledge or understanding of the requirements. The failings are based on what appears to be a collective disregard of the professional and ethical standards required for the practice of law. That is, Ostling & Associates' attorneys involved in this case most certainly know better; they simply do not do better.

In making his pitch that an award of the "no-look" fee should be made, Mr. Follmer says that Ostling & Associates' attorneys have relied on the "rights and responsibilities agreement format" set forth in *In re Robb*, 2014 WL 37371 (Bankr. N.D. Cal. Jan. 3, 2014). Mr. Follmer quotes the *Robb* court in asserting that "no-look" fees create "a compact of sorts between the debtor and counsel that they would work together to achieve the objectives of a chapter 13 case[.]" *Id.* at *4. Because *Robb* is a fairly recent case and post-dates all but the very last steps taken by the attorneys in this case, it is doubtful that Ostling & Associates'

attorneys actually relied on the case for anything that occurred here. And it is unclear why they would rely on the rights and responsibilities set forth in forms used in the Northern District of California rather than the duties expressly set forth in this Court's Standing Order. Nevertheless, *Robb*'s description of the attorney/client relationship in Chapter 13 cases as a compact is apt and consistent with this Court's views. "No-look" fees are a favored way to handle compensation in Chapter 13 cases, and fee agreements for the "no-look" amount should be disturbed only when the quality of the legal work performed falls below the minimum standards required for the professional and competent practice of law. *See Brennan*, 2013 WL 4046447, at *9; *Eskew*, 2012 WL 4866687, at *4-5. Here, the quality of legal work fell below the minimum standards required, and the compact that Mr. Follmer admits exists with the Debtors here was breached. An award of the full "no-look" fee is, therefore, inappropriate.

The problems that plagued this case are the same as those identified in prior cases. Ostling & Associates' attorneys and staff do not do a thorough job of interviewing debtors before case filings and do not do a meaningful review of the information debtors provide before completing schedules, plans, and other documents. Ostling & Associates operates on a "tag-team" basis with multiple attorneys and staff members working on cases even though many of those preparing and filing documents or appearing in court have never met the client and literally have no clue about the client's needs or goals. No particular attorney takes responsibility for a case or for achieving a particular client's goals and ensuring that Ostling & Associates honors its role in the "compact" that Mr.

Follmer admits exists with every client.

Here, Mr. Ostling met with the Debtors twice in June 2012 to discuss a bankruptcy filing. The Debtors returned in January 2013 to meet again with Mr. Ostling for less than half an hour to discuss an upcoming sale of their home and to "bring in paperwork." Mr. Ostling charged no time for reviewing the "paperwork" and, according to the time records, had no further role in the case. Instead, clerical staff members communicated with the Debtors about needed information and prepared all of the documents necessary for the case filing. Mr. Spears met with the Debtors to "sign Emergency Petition" but clocked no time for reviewing the Debtors' information before that short meeting. Only a bare bones petition was filed by Mr. Spears for the Debtors on February 4, 2013.

After the case was filed, clerical staff members communicated further with the Debtors about additional needed information. Those staff members prepared the schedules, the Plan, and other documents and met with the Debtors to have them sign the documents before they were filed. Mr. VanHemert logged a few minutes for reviewing the schedules before they were filed but apparently failed to notice that the commercial building was valued at zero. Mr. Spears logged no more than six minutes in reviewing the Plan before it was filed. Mr. Spears compounded Mr. VanHemert's error by also not noticing that the commercial building was valued at zero even though the Plan proposed to pay a fully secured debt of over $32,000 with respect to the building. Mr. Spears also failed to notice that, although the Plan proposed payment to the DeWitt County Collector for real estate taxes, that creditor had never been scheduled and, accordingly, had no

notice of the case filing or the deadline to file a claim.

Ostling & Associates' attorneys have previously been admonished that their initial client meetings must be more than perfunctory. *See Brennan*, 2013 WL 4046447, at *9. And they have been admonished that their review of client information must also be more than perfunctory. *See Bergae*, 2014 WL 1419586, at *5. To be awarded fees, they must do more than simply provide a typing service for the information provided by the client. *Id.* As evidenced here, Mr. Ostling, Mr. VanHemert, and Mr. Spears have not heeded the Court's admonitions.[1] Mr. Ostling spent just a few minutes with the Debtors when they turned in their paperwork, and then he turned the case over to clerical staff. The staff members prepared all legal documents. Mr. VanHemert failed to spot the huge red flag of a commercial building having no value, and the time records show that he spent not even a minute investigating whether the information on the schedules he was filing was accurate. Mr. Spears signed the Plan that proposed payment of $32,000 for a building alleged to have no value and proposed to cure a real estate tax

---

[1] Ostling & Associates and Mr. Spears, in particular, also have been admonished about relying on their inadequately trained clerical staff for all document preparation and most client interaction. Mr. Spears has been criticized for his practice of "robo-signing" reaffirmation agreements without independently reviewing the documents. *See In re Delaney*, 2011 WL 1749596, at *4-5 (Bankr. C.D. Ill. May 6, 2011). And Mr. Spears' electronic filing privileges were previously temporarily suspended as a sanction for the signing and filing of a Chapter 7 petition for a debtor he had never met and who had dealt only with clerical staff throughout the filing process. *See In re Moffett*, 2012 WL 693362, at * 4 (Bankr. C.D. Ill. Mar. 2, 2012). Mr. Ostling has been repeatedly admonished that he has a duty to establish practices and procedures in his firm that allow the attorneys he employs to practice ethically and competently. *See In re Bardenshtein*, 2009 WL 722590, at *4 (Bankr. C.D. Ill. Mar. 17, 2009); *Delaney*, 2011 WL 1749596, at *4-5.

arrearage to a creditor who had never been scheduled. The problems created by the failure of these attorneys to do a meaningful initial interview with the Debtors and a meaningful review of relevant information as documents were prepared and filed dogged this case for months, resulting in multiple objections from the Trustee and multiple hearings before this Court.

The initial failures in the case were aggravated by the "tag-team" approach to the practice of law at Ostling & Associates. Attorneys Ostling, Abbott, Follmer, Pondenis, Nelson, Spears, and VanHemert have all logged time on the case but none of them have taken responsibility for the case or for achieving the Debtors' goals. Only Mr. Ostling, Mr. Spears, and Mr. Follmer appear to have ever met or communicated directly in any way with the Debtors. And Mr. Follmer's meeting with the Debtors in September 2013 — more than seven months after the case was filed — is the one and only time that an attorney appears to have actually met with the Debtors to discuss the issues involved in resolving their financial problems and getting a plan confirmed. But inexplicably, just three days after that meeting, Mr. Spears filed the Third Amended Plan which provided for both the continued payment of the mortgage on their residence and the surrender of the residence to JPMorgan Chase Bank.

The practice of handing off client matters from attorney to attorney with little communication and coordination is inefficient and unprofessional. *See Bergae*, 2014 WL 1419586, at *6. Ostling & Associates' attorneys have previously been admonished that the practice wastes not only their own time but the time and resources of the Court and the Trustee. *See Brennan*, 2013 WL 4046447, at

*7. The failure of any attorney to take responsibility for this case is the direct cause of the problems here and is the reason that, instead of awarding Ostling & Associates the "no-look" fee, this Court must again take a "close look" at the quality of legal work performed and reduce the fees accordingly. *Id.*

A significant reduction in fees is warranted because all of the problems in this case could have been easily avoided. Both Mr. VanHemert and Mr. Spears should have questioned the zero value placed on the commercial building. Mr. Spears' review of the Plan should have, at a minimum, included a comparison of the Plan provisions with the previously-filed schedules to ensure that scheduled priority and secured creditors were properly treated in the Plan and, conversely, that all such creditors dealt with in the Plan were scheduled. Any attorney, even one who had never met the Debtors, should have the skill to review documents and spot such obvious flaws as the ones that existed here. Further, the ongoing problems in the case were pointed out in detail by the Trustee in his initial confirmation report and his repeated objections to the many amended plans. There is simply no excuse for Ostling & Associates' attorneys to have continued to file unconfirmable plans and to have failed to file required amended schedules when the Trustee had laid out in detail the problems that needed to be addressed. The quality of the legal work here was poor and can justify no more than a minimal fee.

**B. The Fee Application is Inadequate to Justify the Fees Requested**

The Fee Application must be reviewed under the standards set forth in

§330(a)(3) which provides:

> (3) In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including —
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. §330(a)(3).

In the Fee Application, Mr. Follmer specifically acknowledges that "time spent" is a factor to be considered in determining any award of fees to Ostling & Associates. Attached to the Fee Application is an exhibit providing a summary of the time expended by each attorney and an exhibit labeled "Statement for Fees" listing chronological time entries for the attorneys. Each entry on the Statement of Fees shows a date, attorney initials, a description of the work done, an amount

of time expended, and a calculation of the fee for the work based on the hourly rate of the attorney. Nothing in the Fee Application suggests anything other than that the Statement of Fees is based on actual time records maintained by the attorneys involved. Nevertheless, when asked to clarify the methodology used to prepare the Fee Application and the Statement of Fees, Mr. Follmer described a process that does not involve contemporaneous timekeeping.

Mr. Follmer was asked to supplement the Fee Application with an affidavit specifically stating whether Ostling & Associates keeps "contemporaneous time records" for all attorneys and staff, and describing the methodology used to prepare the Fee Application. In response, Mr. Follmer said that Ostling & Associates keeps "contemporaneous transactional records for time purposes[.]" Further, he stated "[t]ime is assigned, if needed, to the record using minimum time standard (sic), not actual time, which said actual time being always equal to or greater that (sic) the time assigned in the billing." Mr. Follmer claimed that a record is kept of every activity undertaken in a case and "[t]hese transactional records can easily be used to construct a billing if said billing is requested." The transactional records are, apparently, copies of documents filed and received along with emails that staff members, including attorneys, send to themselves to record phone conversations or other work for which no other documentary evidence exists. All of the paper is put in a file and then, again apparently, each activity is assigned a time value by the clerical staff member charged with creating an actual bill or Statement of Fees when required. Mr. Follmer claims that this "method of reconstruction of time entries and time standards applied were (sic) in

accordance with customary and ordinary practices of the attorneys of the Illinois

Barr (sic) and of the American and Illinois Bar Associations."

Mr. Follmer asserts that it is accepted practice to use standard time entries

instead of actual time for billing and fee application purposes. But support for his

proposition is limited. There certainly is support for the use of one-tenth of an

hour as a minimum billing increment. *See, e.g.*, *In re Schuman*, 2013 WL 1195279,

at *5 (Bankr. N.D.N.Y. Mar. 22, 2013); *In re Fibermark, Inc.*, 349 B.R. 385, 395

(Bankr. D. Vt. 2006); *see also* United States Trustee's Guidelines for Reviewing

Applications for Compensation, 61 Fed. Reg. 24890 (May 17, 1996); 28 C.F.R. pt.

58, App., ¶(b)(4)(v) (2013). But the use of larger minimum increments for all client

meetings and court hearings is not a generally accepted practice. And the

approved use of a one-tenth of an hour minimum billing increment does not

excuse the requirement that all time should be kept contemporaneously. To the

contrary, without contemporaneous time records, a court cannot determine the

reasonableness of requested fees and may deny all fees. *See In re Basham*, 208

B.R. 926, 931 (9th Cir. BAP 1997); *In re Newman*, 270 B.R. 845, 847-48 (Bankr.

S.D. Ohio 2001).

The problems with the Fee Application caused by the reconstruction of time

entries based on standard minimum increments regardless of the actual amount

of time spent are aggravated by the use of standard or "canned" descriptions of the

tasks described with each time entry. Ostling & Associates has created some "one-

size-fits-all" entries which lump together various tasks, essentially ensuring that

when one task is undertaken, time is logged not only for that task, but also for

other tasks which should be done at the same time. The lumped entries are used regularly of whether the additional tasks or work was actually completed.[2] Additionally, it appears that in preparing the Fee Application, entries were created for tasks which should have been done at a particular time even though no contemporaneously-kept transactional record of the task was made. Several examples of these practices are clearly evident in the Fee Application.

One example involves Mr. Abbott logging three-tenths of an hour on June 27th to "[a]ttend Motion for Relief hearing, travel time to and from, and discussion of outcome with staff." Mr. Abbott appeared telephonically for the hearing and, accordingly, no travel time was incurred. Mr. Follmer says that instead of travel, Mr. Abbott should have logged time for preparation. But the Fee Application already contains an entry for Mr. Abbott's preparation on the day prior to the hearing, and if Mr. Abbott spent additional time preparing, there is no reason why he would not have properly clocked time for that activity. The only explanation for Mr. Abbott claiming travel time is the use of a "canned" entry which includes "travel to and from" for every hearing even when no travel actually occurred. And if travel is included in every entry even if no travel occurs, then it may well be that "discussion of outcome with staff" is included in every entry regardless of whether any meaningful discussion occurs. Virtually identical language is used in entries

---

[2] Even when all tasks have been completed, the "lumping" of multiple tasks into one time entry is not an acceptable practice. *See In re Wiedau's, Inc.*, 78 B.R. 904, 908 (Bankr. S.D. Ill. 1987). Each service provided should be itemized separately so that the reasonableness of the compensation sought for each service can be determined. "[S]ervices which have been lumped together are not compensable." *Id.*

by Mr. Follmer for attending hearings on May 14th and November 11th, and by Mr. Nelson for a July 23rd appearance, suggesting that language has been standardized by Ostling & Associates to record all hearings. The use of such "canned" entries is misleading and unprofessional. Such entries cannot be used to justify a fee award.

In another example, Mr. Spears claims two-tenths of an hour to attend the §341 meeting with the Debtors on April 8th, one-tenth of an hour to meet with the Debtors that same day, and an additional two-tenths of an hour on April 7th to prepare for the meeting. The problem with these entries is that the §341 meeting took place on April 4th, not April 8th. According to Mr. Follmer, Ostling & Associates' attorneys email themselves to create contemporaneous transaction records. But Mr. Spears would not have emailed himself on April 8th saying that he had been at a §341 meeting with the Debtors that day and he would not have emailed himself on April 7th noting that he had prepared that day for a §341 meeting that had occurred three days before. Rather, it appears that the entries on the Fee Application for Mr. Spears' time were reconstructed or perhaps, more precisely, simply made up based on a misreading of the court docket.

The Trustee files a confirmation report at the conclusion of every §341 meeting containing information about the case and the Trustee's recommendation regarding confirmation of a pending plan or the need for an amended plan. The reports are docketed publicly along with the Trustee's docketing of a notice using the event "Meeting of Creditors Held as Scheduled." The Trustee files his reports and the notices promptly, but there is no requirement that the docketing be done

on the same day a §341 meeting is held. Here, the §341 meeting was held on April 4th and the confirmation report and notice were docketed by the Trustee on April 8th. The report clearly indicates the actual date of the meeting, but a cursory review of the docket and the "meeting held" event might cause someone who did not take the time to review the confirmation report to think the meeting was held on April 8th.

Thus, the only logical explanation for all of Mr. Spears' time records related to the §341 meeting to be incorrectly dated is that the records were reconstructed and the reconstruction was based on the April 8th docket entry. Someone, believing that Mr. Spears attended the §341 meeting on April 8th, created a record to that effect and then added time for preparation the day before and a meeting with the Debtors afterwards. But if Mr. Spears did not create a contemporaneous record of his activities and time — and he obviously did not — it was not appropriate for Mr. Follmer or someone working at his direction to simply make up records to reflect what they think Mr. Spears might have or should have done. The use of reconstructed time entries is misleading and unprofessional. Such entries cannot be used to justify a fee award.

In attempting to justify Ostling & Associates' record keeping practices, Mr. Follmer says that if the firm recorded all of the time actually spent on a case such as this, the fee charged would be much larger than the $3300 "no-look" fee amount agreed to by the Debtors here. But that assumes that fees could be justified for all the wasted time in this case. And the argument misses the point that if Ostling & Associates' attorneys kept accurate, contemporaneous time

records, they would soon see for themselves that they are wasting their own time, money, and resources with their inefficient and unprofessional practices.

Mr. Follmer's final claim is that Ostling & Associates' record keeping practices follow the guidelines of the American Bar Association and the Illinois State Bar Association. Mr. Follmer does not, however, provide citation to any publication of either organization to support his claim. In the absence of such citation, this Court finds it highly unlikely that either organization has any published guidelines for record keeping, time keeping, or billing practices which recommend the wholesale reconstruction of time entries for billing purposes.

The Fee Application is severely deficient. It supports no more than the award of a minimal fee.

## IV. Conclusion

Based on the poor quality of the work performed and the deficient Fee Application, Ostling & Associates will be awarded only a minimal fee of $600. Because the Debtors paid $1000 as a retainer, the firm will be required to disgorge $400.

As set forth above, the problems with the quality of legal work by Ostling & Associates' attorneys have been pointed out before. The problems could be remedied by the assignment of an attorney to be responsible for each case and by all attorneys and staff members taking more time and being more careful in their preparation and review of documents. And although neither the Debtors nor the attorneys are required to agree with or concede every objection made by the

Trustee, the attorneys must carefully review the Trustee's objections and consider the appropriate responses to be made. When the Trustee lays out in detail inconsistencies, errors, and mistakes in the documents, it makes no sense to ignore that information and continue to file flawed documents. To the extent Ostling & Associates' attorneys continue their "tag-team" practice of handling cases and continue to make the types of repeated mistakes made here, they will not be routinely entitled to an award of the "no-look" fee.

The deficiencies in the Fee Application are equally troubling. The time entries are misleading and inaccurate. Despite an admonition in a prior case that this Court was concerned about whether Ostling & Associates' applications were based on contemporaneous time keeping, full disclosure about the extent of their reconstruction of records was not made in the Fee Application or the supplemental affidavit of Mr. Follmer. *See Bergae*, 2014 WL 1419586, at *7. Proper consideration of the factors involved in awarding fees cannot be made unless a request for compensation is based on contemporaneously-kept time records. This Court cannot make Ostling & Associates keep such records. But to the extent the records are not kept, any future applications for compensation must clearly identify any time entry which is not based on a contemporaneously-kept time record, and the requested fees will be reduced accordingly.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

See written Order.

### 

-22-